# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**LOUIS ROY CHAPMAN,**

     Plaintiff,

v.                                                                                      Civil Action No. **3:18CV597**

**PHYLLIS SMITH,** *et al.,*

     Defendants.

## MEMORANDUM OPINION

Louis Roy Chapman, a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this civil action under 42 U.S.C. § 1983.[1] In his Particularized Complaint, Chapman alleges, *inter alia,* that while incarcerated at the Lawrenceville Correctional Center ("LCC"), the Defendants[2] violated his rights under the Equal Protection Clause[3] by discriminating against him in a variety

---

[1] That statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[2] The named Defendants are: Phyllis Smith, an Education Director at LCC; D. Kreitz, a Job Coordinator at LCC; Shaniqua Moore, a Law Library Supervisor at LCC; Dave Robinson, the Chief of Operations for the Virginia Department of Corrections ("VDOC"); T. Walker, a Recreation Supervisor at LCC; Marilyn Shaw, Chief of Housing and Programs at LCC; Crystal Jones, a Facility Ombudsman at LCC; Renee Woodson, a Regional Ombudsman for the VDOC; K. Cosby, another Regional Ombudsman for the VDOC; L. Torgenson, a Safety Officer at LCC; Corrections Officers T. Neville, T. Sommerville, K. Thomas; Global Experts and Outsourcing, Inc. ("Geo"); and, the Commonwealth of Virginia. (ECF No. 27, at 1.) Chapman has thus far failed to serve Defendants Smith and Kreitz.

[3] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

of ways because he is a white man.  (ECF No. 27, at 3–7.)[4]   The Court construes Chapman's

pleadings to raise the following eleven claims for relief:[5]

Claim One: Defendants Smith, Kreitz, and Shaw will not process Chapman's job application for various clerk positions because Chapman is white, and they have only hired "Black and Hispanic" clerks.  (ECF No. 97, at 6.)

Claim Two: Defendants Smith, Moore, and Shaw have "a black authors and Spanish language section with a plaque," in the "regular library," but "there are NO plaques for any other race in the world."  (Id.)

Claim Three: Defendants Smith, Moore, and Shaw "included Martin Luther King Jr. [Day] on the law library/library calendar . . . [but] did not include Robert E. Lee [Day] or Thomas "Stonewall" Jackson [Day], but closed the law library/library both dates."  (Id. at 6–7.)

Claim Four: Defendants Smith, Moore, and Shaw "accused Chapman of being RACIST."  (Id. at 7.)

Claim Five: Defendants Smith, Moore, and Shaw "had a black history program scheduled . . . the only race . . . given special treatment."  (Id.)

Claim Six: Defendants Smith, Shaw, Walker, and Geo "designed recreation for blacks only."  (Id.)

Claim Seven: Defendants Shaw, Robinson, and Geo "have a contract to air TVONE, an ALL Black TV channel, . . . in . . . [the] dayroom . . . TVONE's language is racist and carries sex offenders . . . there is NO ALL WHITE TV channel."  (Id.)

Claim Eight: Defendants Jones, Woodson, and Cosby denied Chapman a tracking number twenty-one times for "regular grievances for ALL Black officers

---

[4] The Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions.  To the extent possible, the Court corrects the spelling, capitalization, and punctuation in the quotations from the parties' submissions.

[5] In his hand-written, forty-two-page Particularized Complaint, which can most generously be described as rambling, disjointed, and, at times, incoherent, Chapman fails to delineate clearly between his various claims.  (See ECF No. 27, at 1–42.)  Fortunately, in his response to one of the pending Motions for Summary Judgment presently before the Court, Chapman offers a more concise description of his claims under the heading "Summary of Claims." (ECF No. 97, at 6–8.)  Having reviewed both documents, the Court will refer to this latter iteration of Chapman's claims to help frame and contextualize the issues before it.

and staff . . . giving Chapman a tracking number for a white officer <u>only</u>." (*Id.*)

Claim Nine:  Defendant Jones "refused to give Chapman a grievance tracking number for L. Torgenson, safety officer, concerning unsanitary showers." (*Id.* at 8.)

Claim Ten:  Defendant Summerville "said '<u>shit happens, deal with it</u>,' and refused to have the table wiped clean where Chapman and other white men ate . . . racism . . . [Defendant] Neville laughed at this racist act." (*Id.*)

Claim Eleven: Defendant Thomas "yelled" at Chapman, "I'm not going to do it," when Chapman requested that she "get someone to wipe the table off where Chapman and [other] white men ate." (*Id.*)[6]

Defendants Cosby, Woodson, and the Commonwealth of Virginia filed a Motion to Dismiss. (ECF No. 69.)  The Court granted that Motion and dismissed the claims against those Defendants in a contemporaneous order. (*See* ECF No. 153.)  In so doing, the Court exercised its duty under the Prison Litigation Reform Act (the "PLRA") and dismissed some of Chapman's claims because they were frivolous or failed to state a claim.  Specifically, the Court: dismissed all of Chapman's claims against the Commonwealth of Virginia; dismissed all claims under the Public Accommodations Act; dismissed all aspects of Claims 4, 9, 10, and 11; dismissed the Eighth Amendment and due process aspects of Claim 8 against Defendant Jones, Woodson, and Cosby; and, dismissed the equal protection aspects of Claim 8 against Defendants Woodson and Cosby. Thus, only Claims One, Two, Three, Five, Six, Seven, and the equal protection aspects of Claim Eight against Defendant Jones remain.

---

[6] Chapman also characterized his pleadings as stating a twelfth claim against Francis Jordan, J. Worsham, and Marc Finney for alleged false statements.  These individuals are not parties to this litigation.  Chapman sought to add them by way of a Motion to Amend and a Proposed Second Particularized Complaint. (ECF No. 61.)  The Court, however, denied that motion to amend. (ECF No. 98, at 3–4.)  Accordingly, the Court will not address Chapman's putative twelfth claim.

The matter is before the Court on the Motions for Summary Judgment filed by Defendants Geo, Jones, Robinson, Shaw, Walker, and Moore (the "Defendants") as to Chapman's Equal Protection Clause Claims. (ECF Nos. 79, 103.) Chapman has responded. For the reasons stated below, the Defendants' Motions for Summary Judgment will be GRANTED.[7]

## I. Summary Judgment Standard

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is the responsibility of the party seeking summary judgment to inform the Court of the basis for the motion and to identify the parts of the record that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)). Mere conclusory allegations and bare denials are insufficient to support the nonmoving party's case. *Erwin v. United States*, 591 F.3d 313, 319–20 (4th Cir. 2010).

---

[7] In addition to the Equal Protection claims addressed by the pending Motions for Summary Judgment, Claims One, Two, Three, Five, Six, Seven, and Eight, when liberally construed, also allege violations of Chapman's Eighth Amendment rights under the United States Constitution. (*See* ECF No. 27, at 6, 9, 11, 15, 16, 19, 22.) These claims were not addressed in the pending Motions for Summary Judgment. Accordingly, the Court does not address them now. Nevertheless, as noted above, the Court previously dismissed the Eighth Amendment aspects of Claim Eight.

In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (citing *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 & n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

In support of their Motions for Summary Judgment, Defendants submit: (1) the Declaration of Anthony Parker, the Chief of Security at LCC, ("Parker Decl.," ECF No. 80-1); (2) the Declaration of Marc L. Finney, the current Librarian at LCC ("Finney Decl.," ECF No. 80-2); (3) the Declaration of Andrea Green, the current Job Coordinator at LCC ("Green Decl.," ECF No. 80-3); (4) the Declaration of Defendant Jones ("Jones Decl.," ECF No. 80-4); (5) VDOC Operating Procedure No. 866.1 ("OP 866.1," ECF No. 80-5); (6) an Offender Grievance Report for Chapman ("Grievance Report," ECF No. 80-6); and, (7) a spreadsheet relating to certain grievance responses (ECF No. 80-7).

In response, Chapman submits, *inter alia*, several of his own affidavits (*see* ECF Nos. 97-1; 97-6, at 10–11, 18–20; 97-7, at 7–16; 105-2), which are mostly handwritten and at times difficult to decipher, as well as a host of documents relating to his various grievance proceedings (*see* ECF

5

Nos. 97-2; 97-3; 97-4; 97-5; 97-6). The Court will consider these submissions in determining the propriety of the Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(c).

The Court resolves this matter in light of the foregoing principles and draws all permissible inferences in favor of Chapman.

## II. Applicable Law

The Equal Protection Clause of the Fourteenth Amendment commands that similarly situated persons be treated alike. *See City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). To survive summary judgment, a plaintiff must demonstrate: (1) "that he has been treated differently from others with whom he is similarly situated," and (2) that the differing treatment resulted from intentional discrimination. *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). In so doing, the plaintiff must set forth "specific, non-conclusory factual [evidence] that establish[es] improper motive." *Trulock v. Freeh,* 275 F.3d 391, 405 (4th Cir. 2001) (quoting *Crawford–El v. Britton*, 523 U.S. 574, 598 (1998)).

If a plaintiff satisfies the above, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Morrison*, 239 F.3d at 654 (citations omitted). "To account for the unique health and welfare concerns in the prison context," the Court's "review of a plaintiff's prison decision or policy is more demanding, as [courts] 'accord deference to the appropriate prison authorities.'" *Fauconier v. Clarke*, 966 F.3d 265, 277 (4th Cir. 2020) (quoting *Turner v. Safley*, 485 U.S. 78, 85 (1987)). "In a prison context," disparate treatment passes muster so long as "the disparate treatment is 'reasonably related to [any] legitimate penological interests.'" *Veney v. Wyche,* 293 F.3d 726, 732 (4th Cir. 2002) (alteration in original) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)).

The Equal Protection Clause does not require "things which are different in fact or opinion to be treated in law as though they were the same." *Moss v. Clark*, 886 F.2d 686, 691 (4th Cir. 1989) (quoting *Plyler*, 457 U.S. at 216). Instead, "the class to which [an inmate] belongs consists of the persons confined as he was confined, subject to the same conditions to which he was subject." *Id.* (alteration in original) (citation omitted).[8]

### III. Analysis

Chapman has alleged a host of putative equal protection violations on the part of prison staff, which he maintains were motived by the fact that he is a white man. As noted above, the Court has already dismissed a number of Chapman's claims as frivolous or otherwise failing to state a claim. The Court now addresses each of the remaining claims in turn.

### A.      Gender Bias

In his Particularized Complaint, Chapman alleges that he was discriminated against by the Defendants on the basis of "Gender Bias" and "Racial Discrimination." (ECF No. 27, at 3.) As an initial matter, the Court notes that, in actuality, the gravamen of Chapman's claims relate solely to the issue of racial discrimination. Nowhere in his pleadings does Chapman allege, must less prove, that he was treated differently than a similarly situated female. *See Morrison*, 239 F.3d at 654.

---

[8] Chapman also alleges the Defendants violated his right to be free from discrimination under Article I, Section 11 of the Virginia Constitution. Because "[t]he Virginia Constitution affords no greater protection to be free from government discrimination than the equal protection clause in the Fourteenth Amendment, the same analysis applies to [Chapman's] claims under both . . . federal and state law." *Farley v. Clarke*, No. 7:15–CV–00352, 2016 WL 8540135, at *18 n.25 (W.D. Va. Dec. 27, 2016) (citing *Lee v. York Cty. Sch. Div.*, 418 F. Supp. 2d 816, 835 (E.D. Va. 2006), and *Archer v. Mayes*, 194 S.E.2d 707, 711 (Va. 1973)), *report and recommendation adopted*, No. 7:15–CV–00352, 2017 WL 1049579 (W.D. Va. Mar. 17, 2017). To the extent the Court resolves any of Chapman's federal claims, the same resolution applies to his corollary state claims.

Accordingly, to the extent any of Chapman's claims allege gender bias, that portion of his claims will be DISMISSED.

**B.    Claim One**

In Claim One, Chapman alleges that Defendants Smith, Kreitz, and Shaw would not process Chapman's job application for various clerk positions because Chapman is white, and they have only hired "Black and Hispanic" clerks. (ECF No. 97, at 6.)  As noted above, Chapman has thus far failed to serve Defendants Smith and Kreitz.  Accordingly, the Court will address Claim One only insofar as it pertains to Defendant Shaw.

For purposes of summary judgment, the following facts are established.  If an inmate wishes to apply for a job, he or she submits an application to the job coordinator.  (Green Decl. ¶ 7.)  The job coordinator reviews the inmate's qualifications, and if qualified, sends the application to the job supervisor.  (*Id.*)  There are various criteria for screening candidates, including disciplinary history, security classifications, and education.  (*Id.*)  Race is not a criterion.  (*Id.*)  If an inmate is deemed unqualified or the job sought is not available, the job coordinator returns the job application to the inmate with an explanation.  (*Id.* ¶ 8.)  If an inmate is placed in a job, the job coordinator will retain a copy of the inmate's application.  (*Id.*)  If the inmate is not placed in the job, the application is not retained.  (*Id.*)  There are presently "no open positions available." (*Id.* ¶ 9.)

Chapman argues that Defendant Shaw failed to process his application for a clerk position in the "unit manager's or counselor's office." (ECF No. 97, at 6.)  However, Chapman has failed to submit any admissible evidence to support his claim that he was purposefully discriminated against based upon his status as a white male.  As a baseline, Chapman has not submitted proof that he actually applied for, or even attempted to apply for, any sort of clerk position at a time

when that position was open and available. He has not submitted a job posting or any other evidence to indicate that the position he desired was not already filled during the relevant time periods. Further, he has not submitted any evidence to establish what the qualifications for the position were, much less established that his personal qualifications (which he has recited multiple times) were indeed compatible with those specific requirements. Nor has he identified a similarly situated comparator whom he maintains was treated differently in applying for the unit manager and counselor's office clerk positions that he alleges Defendant Shaw prevented him from obtaining.[9]

Even if the Court were to ignore these basic issues, Chapman has offered nothing, aside from his own speculation and subjective beliefs, to indicate that any decision made by Defendant Shaw was motivated by race in any way, shape, or form, much less that she harbored any animosity towards him because he was white. Chapman's allegations concerning Shaw are speculative and conclusory and cannot survive summary judgment. *See Erwin v. United States*, 591 F.3d 313, 319–20 (4th Cir. 2010) (discussing that conclusory allegations and bare denials are insufficient to support the nonmoving party's case).

Accordingly, Claim One will be DISMISSED as to Defendant Shaw.

---

[9] Chapman alleges generally in unsworn pleadings that a black inmate, whom he maintains was less qualified than him, was given the library clerk position. (*See* ECF No. 27, at 7.) But he has failed to allege, much less prove, the basic details of this person's putative hiring, including when it occurred. He has further failed to submit proof that he applied for the position at a time and in a manner such that he would have directly competed against this person for the position. Despite the obvious deficiencies in Chapman's pleading of these facts, the Court need not address these failures because Chapman has failed to allege, much less prove, facts indicating that Defendant Shaw had anything to do with the library clerk hiring decision. Rather, Chapman alleges that Defendant Smith made that decision. (*Id.*) Chapman's claims against Defendant Shaw involve Chapman's inability to secure a clerk position in the unit manager's office and the counselor's office, not the library.

## C.      Claim Two

In Claim Two, Chapman alleges that Defendants Smith, Moore, and Shaw have "a black authors and Spanish language section with a plaque," in the "regular library," but "there are NO plaques for any other race." (ECF No. 97, at 6.) Due to Chapman's failure to serve Defendant Smith, the Court will address this claim only insofar as it involves Defendants Moore and Shaw.

For purposes of summary judgment, the following facts are established. The "library includes African American, Native American, Spanish-speaking and Western/European fiction and non-fiction books." (Finney Decl. ¶ 6.) "The Library is organized with a specific section containing the African American and Spanish-speaking collections." (*Id.*) "The overwhelming majority of the library collection is comprised of American and European publications predominantly authored by Caucasian writers." (*Id.*)

Chapman argues that if LCC is going to have a section for "black authors" and a "Spanish language" section, marked by a plaque, there must be a similar "plaque for all other races," or there should be no plaques at all. (ECF No. 97, at 10.) Chapman maintains that "[t]here is nothing special about black authors." (*Id.* at 21.) Chapman further sees no value in having a Spanish language section, because "[t]his is the United States of America," and the "official language is English," and he seems to assert that Spanish-speaking inmates should simply "Assimilate." (*Id.* at 22.) Chapman maintains that LCC is "setting out one race over another," which he alleges is "offensive, and humiliating and degrading to [him]." (ECF No. 27, at 9.) Defendants Moore and Shaw argue that the undisputed facts show that they have "not subjected [Chapman] to disparate treatment or discriminatory animus." (ECF No. 80, at 10.)

Although Chapman offers no specific authorities to support his position, the Court construes his claim to be one of "stigmatic injury." *See, e.g., Moore v. Bryant*, 853 F.3d 245, 249

10

(5th Cir. 2017).   In *Moore*, an African-American attorney sued the Governor of Mississippi, alleging that his "unavoidabl[e] expos[ure] to the state flag," which, in part, "depict[ed] the Confederate battle flag," stigmatized him, made him "feel like a second-class citizen," and caused him "physical and emotional injuries." *Id.* at 248–49.

In resolving the case, the Fifth Circuit determined that in order to plead a stigmatic injury, a "[p]laintiff must plead that he was personally subjected to discriminatory treatment." *Id.* at 249 (citations omitted).   The court held that under the Equal Protection Clause, "exposure to a discriminatory message, without a corresponding denial of equal treatment, is insufficient to plead an injury." *Id.* at 250 (citations omitted).   This is because, "the gravamen of an equal protection claim is differential governmental treatment, not differential governmental messaging." *Id.* (citations omitted).

In so holding, the court expressly rejected the plaintiff's attempt to infuse Establishment Clause[10] jurisprudence, into a claim under the Equal Protection Clause because "the injuries protected against under the Clauses are different." *Id.*   While the Establishment Clause "prohibits the Government from endorsing a religion, and . . . directly regulates Government speech if that speech endorses religion," "[t]he same is not true under the Equal Protection Clause." *Id.*   In the end, the court held that the plaintiff lacked standing to bring his claim that the "flag's message" was "painful, threatening, and offensive," and affirmed the district court's dismissal of it because the plaintiff had failed to plead a personal injury. *Id.* at 249.

There are many parallels between Chapman's allegations and the claims asserted in *Moore*. Chapman claims that the plaques designating the Spanish-language and "black authors" sections

---

[10] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.

of the prison library are "offensive, and humiliating and degrading to [him]," (ECF No. 27, at 9), in much the same way that the plaintiff in *Moore* complained the Mississippi state flag was "painful, threatening, and offensive" to him, *Moore*, 853 F.3d at 249. As was the case with the plaintiff in *Moore*, who failed to show that he had been treated differently than anyone else who saw the flag, Chapman has likewise failed to show that he has been treated any differently than anyone else who used the library. Chapman does not allege and has not proven that he was prohibited from accessing any materials in the library, the "overwhelming majority" of which were written by Caucasian authors. At most, he has shown that he was exposed to "differential governmental messaging." *Id.* at 250. However, without more, even "exposure to a discriminatory message . . . is insufficient to plead an equal protection case." *Id.* (citation omitted).

Accordingly, Claim Two will be DISMISSED as to Defendants Moore and Shaw.[11]

### D.   Claim Three

In Claim Three, Chapman alleges that Defendants Smith, Moore, and Shaw "included Martin Luther King Jr. [Day] on the law library/library calendar . . . [but] did not include Robert E. Lee [Day] or Thomas "Stonewall" Jackson [Day]." (ECF No. 97, at 6–7.) Again, due to Chapman's failure to serve Defendant Smith, the Court will address this claim only insofar as it involves Defendants Moore and Shaw.

---

[11] The United States District Court for the District of Columbia recently applied *Moore* in a similar fashion to dismiss an Equal Protection Clause challenge to a decision by the Mayor of the District of Columbia to paint a "BLACK LIVES MATTER" on the street "just outside the White House." *Penkoski v. Bowser*, No. 20–cv–01519 (TNM), 2020 WL 4923620, at *1, 5 (D.D.C. Aug. 21, 2020). There, a group of "non-black Christians," challenged the "mural" because they "perceive[d] it as a sign that they [were] not welcome in the District." *Id.* at *1. Because the plaintiffs did not show that the Mayor had "subjected them to discriminatory treatment because of their race," the court held that any exposure they may have had to a "discriminatory message" was insufficient to establish standing, and their claim was dismissed. *Id.* at *5.

For purposes of summary judgment, the following facts are established.  LCC is operated by Geo, a Florida corporation, which operates correctional facilities around the county.  (Finney Decl. ¶ 7.)  LCC observes numerous national holidays and is generally closed on those days.  (*Id.*)  Martin Luther King Day is one of the holidays observed.  (*Id.*)  Lee-Jackson Day, a state holiday previously observed in the Commonwealth of Virginia, is not one of the holidays observed by LCC.[12]  (*Id.*)

Chapman's primary grievance seems to be that even though the library is closed on both Martin Luther King Day and Lee-Jackson Day, the Defendants have failed to write Lee-Jackson Day on the library calendar as the reason for the second closure.  (ECF No. 27, at 11–12.)  Chapman argues, without citing any authority in support, that if Geo is to do business in Virginia, then it was required to recognize Lee-Jackson Day.  (*Id.* at 12.)  Chapman further argues that LCC's failure to include Lee-Jackson Day on the calendar is "offensive, humiliating and degrading" to him, as a "native born Virginian."  (*Id.* at 11–12.)  Chapman points out that Martin Luther King was not from Virginia, and he claims that King "caused riots."  (ECF No. 105, at 9.)

Defendant Shaw argues that the undisputed facts show that they have "not subjected [Chapman] to disparate treatment or discriminatory animus."  (ECF No. 80, at 10.)  As an initial matter, the record does not indicate that Defendants Moore and Shaw had anything to do with deciding when the library was closed or what holidays would be observed.  Rather, it appears that someone else at Geo may have been responsible for those decisions.  Chapman did not expressly name Geo in Claim Three.  However, even if he had, Claim Three would still fail for the same reasons that Claim Two failed.

---

[12] Since Chapman filed his Particularized Complaint, Virginia has eliminated Lee-Jackson Day as a holiday.  *See* 2020 Va. Acts ch. 418; Va. Code § 2.2-3300.

Chapman is again claiming a stigmatic injury because a holiday that he does not prefer is being celebrated, and a holiday that he does prefer is being overlooked. The decision of which holidays to include or, conversely, exclude from a calendar can be construed as a message, much the same as a flag, a plaque, or a mural: it can speak to the relative value the creator of the calendar places on the holidays it chooses to commemorate and those it chooses not to commemorate. At its base, Chapman's argument is that LCC has engaged in "differential governmental messaging" concerning the relative value it places on Martin Luther King Day and Lee-Jackson Day. As discussed above, "differential governmental messaging," without "differential governmental treatment," is not actionable under the Equal Protection Clause. *Moore*, 853 F.3d at 250. Here again, Chapman has failed to demonstrate that he has suffered differential treatment from anyone at LCC, much less that he was treated differently because of his race. Indeed, from the record before the Court, it appears that everyone at LCC was presented with the same calendar which observed the same holidays, even if the holidays observed were not the holidays Chapman would have chosen.

Accordingly, Claim Three will be DISMISSED as to Defendants Moore and Shaw.

**E.     Claim Five**

In Claim Five, Chapman alleges that Defendants Smith, Moore, and Shaw "had a black history program scheduled . . . the only race . . . given special treatment." (ECF No. 97, at 7.) Here again, due to Chapman's failure to serve Defendant Smith, the Court will address this claim only insofar as it involves Defendants Moore and Shaw.

For purposes of summary judgment, it appears that the Defendants concede that the library at LCC does celebrate Black History Month. (ECF No. 80, at 2, 10.) Defendants point out that Black History Month was recognized on a national level by Congress in 1986. (*Id.* at 10.) As

such, they argue that its celebration is a longstanding national tradition, and therefore, Chapman cannot show that their observance of Black History Month results from "purposeful or intentional discrimination intended to demean Chapman." (*Id.*) Defendants argue that the undisputed facts show that they have "not subjected [Chapman] to disparate treatment or discriminatory animus." (*Id.*)

Chapman responds that "[t]here is nothing special about black history that separates it from the history of any other race." (ECF No. 97, at 10.) He goes on to argue that "[j]ust because the US Congress designated [Black History Month] doesn't make it right." (*Id.*) Chapman makes clear that he is upset because there was not a scheduled observation for "Caucasian [history], Native American [history], North African [history], or any other race in the world." (ECF No. 105, at 9.) Chapman claims that he "cannot relate to black history," and laments the absence of some other program "to which Chapman can relate." (*Id.* at 10.) Chapman has again failed to cite any pertinent authorities to support his arguments on this position.

Here again, Chapman's claim sounds not in terms of a personal injury suffered due to discriminatory treatment, but in terms of a perceived stigmatic injury caused by governmental messaging that does not align with his viewpoint. *See generally Moore*, 853 F.3d 245. Chapman is upset because LCC has chosen to observe an event which Chapman "cannot relate to," and has opted not to institute an equivalent event, "to which Chapman can relate." As with its selection of which holidays to observe, LCC's decision to observe Black History Month and not to institute a similar observation for any other race can be construed as a message that speaks to LCC's relative values and priorities. However, as stated above, exposure to "differential governmental messaging," without "differential governmental treatment," is not actionable under the Equal Protection Clause. *Id.* at 250. It appears that all the inmates at LCC were exposed to the same

15

message about Black History Month that Chapman was, and Chapman has failed to demonstrate that he was denied access to any services or materials that were available to other inmates, or that he was otherwise subject to any treatment that was different than a similarly situated inmate due to LCC's decision to observe Black History Month.

Accordingly, Claim Five will be DISMISSED as to Defendants Moore and Shaw.

### F.     Claim Six

In Claim Six, Chapman alleges that Defendants Smith, Shaw, Walker, and Geo "designed recreation for blacks only." (ECF No. 97, at 7.) In particular, Chapman alleges that the Defendants closed a ballfield where Chapman and other white inmates liked to play softball. (ECF No. 27, at 16–17.) Because Chapman has failed to serve Defendant Smith, the Court will address this claim as it relates to Defendants Shaw, Walker, and Geo.

For purposes of summary judgment, the following facts are established. "At least four years ago, the decision was made to close the baseball fields." (Parker Decl. ¶ 6.) These recreational spaces added a large perimeter area that was difficult to monitor. (*Id.*) Consequently, "the ballfields created opportunities for the infiltration of contraband — like cell phones, drugs, and other prohibited items." (*Id.*) Individuals would "throw[] contraband over the fences." (*Id.*) LCC "first responded to this threat by erecting a nuisance fence." (*Id.* ¶ 7.) However, "this proved to be ineffective." (*Id.*) LCC, with the consent of the VDOC, decided to close the ballfields indefinitely. (*Id.*) This decision was made entirely due to security concerns and "was in no way motivated by the race of the offenders who may have used that space." (*Id.* ¶ 8.) There remain, among other things, two external recreation areas, an indoor gym, and a walking track at LCC. (*Id.* ¶ 9.) "Access to the recreation yards is granted by housing unit." (*Id.* ¶ 10.) "The housing

units rotate between the two recreation yards on a schedule." (*Id.*) "Race is not a criterion in granting access to the recreation yards," or in an inmate's housing assignment. (*Id.*)

Defendants Shaw, Walker, and Geo argue that there are "penological justifications" for the closure of the ballfield and that the undisputed facts show that they have "not subjected [Chapman] to disparate treatment or discriminatory animus." (ECF No. 80, at 2, 10–11.) Chapman responds by positing: "Where on the recreation yards . . . can Chapman and white men participate in softball?" (ECF No. 97, at 19.) Chapman answers his own question: "No Where." (*Id.*) Chapman argues that the "recreation yard is adequate if you are Black, but NOT for Chapman, or if you are White." (ECF No. 27, at 18.) Chapman further questions the wisdom and efficacy of the decision to close the ballfield, claiming that it "did nothing to stem the tide of drugs and cell phones coming into the facility," and ultimately calling the security issue raised by Defendants "fake." (ECF No. 97, at 19).

Chapman's claim fails at this in several ways.  First, he has failed to show that he was treated differently than anyone else who used the ballfield prior to its closure.  Second, he has not shown that the decision to close the ballfield resulted from discriminatory intent.  To the contrary, the record makes clear that race was not a consideration in the decision to close the ballfield, nor is it a consideration in granting access to the recreation areas.

Instead, the ballfield represented a "large perimeter" which was "difficult to monitor." Contraband had been thrown over the fence and made its way into the facility.  LCC took the less drastic step of putting up a "nuisance fence," but this was "ineffective."  Contraband was still coming into the facility through the ballfield.  Chapman has offered no competent evidence to counter this assertion.  Rather, he has provided the Court with his own personal beliefs as to the efficacy of this security measure.  As for his claim that the security concerns were somehow "fake,"

17

and that the true motive for the closure was to discriminate against him and other white men, Chapman has offered nothing more than rank speculation. Because Chapman has failed to rebut the Defendants' evidence with "specific, non-conclusory factual [evidence] that establish[es] improper motive," this claim will not survive summary judgment. *Trulock*, 275 F.3d at 405

Accordingly, Claim Six will be DISMISSED as to Defendants Shaw, Walker, and Geo.[13]

### G.    Claim Seven

In Claim Seven, Chapman alleges that Defendants Shaw, Robinson, and Geo "have a contract to air TVONE, an <u>ALL Black</u> TV channel, . . . in . . . [the] dayroom . . . TVONE's language is racist and carries sex offenders . . . there is <u>NO ALL WHITE</u> TV channel." (ECF No. 97, at 7.) Chapman maintains that the programing on TvONE, which includes "The George Jefferson Show" and "The Bill Cosby Show" is offensive to him. (ECF No. 27, at 19.) He describes the language used by "George Jefferson," such as "Honkey," and "Cracker," as "racist with ethnic connotations," and maintains that it is "humiliating and degrading" to him. (*Id.*) He further alleges that Bill Cosby is a sex offender, and his mere presence on the TV screen is offensive. (*Id.*)

For purposes of summary judgment, the following facts are established. "During their free time, inmates . . . enjoy access to a day room area within their assigned housing pod." (Parker Decl. ¶ 11.) There is a television in the day room. (*Id.*) Inmates may also have a television in their personal cell. (*Id.*) LCC has a contract with a company called Correctional Cable TV. (*Id.*) The service provided includes several channels. (*Id.*) TvONE is a channel that is included in the

---

[13] Alternatively, had Chapman shown some sort of legally cognizable disparate treatment, his claim would have nevertheless failed, as the decision to close the ballfield was "reasonably related" to ensuring the security of inmates and staff at LCC, an obviously "legitimate penological interest." *Veney*, 293 F.3d at 732 (citation omitted).

basic cable package. (*Id.*)  LCC "does not have a contract directly with TvONE." (*Id.*)  The television in the dayroom is "controlled by inmates using a remote control." (*Id.*)

Defendants Shaw, Robinson, and Geo argue that the undisputed facts show that they have not subjected Chapman to disparate treatment or discriminatory animus. (ECF No. 80, at 10.) They further argue that the "inmates must collectively choose the programing in the day room area, and those who are dissatisfied may watch television in their cell." (*Id.* at 11.)  Chapman responds by claiming that the "Defendants are promoting a Sex Offender and [a] Racist." (ECF No. 97, at 21 (emphasis omitted).)  Chapman further suggests that "[m]aybe Chapman does not have money to buy a TV or wants to be in the POD 'Common Area' for all men," but he never states whether either condition is indeed true. (*Id.* at 13).  And he never suggests an "all white" alternative TV channel, which he seems to believe should be offered in place of or as a supplement to TvONE.

As an initial matter, Chapman has failed to point to a similarly situated inmate who has been treated differently than he has.  Moreover, nothing in the record indicates that Defendants Shaw, Robinson, or Geo did anything to cause Chapman to be treated any differently than any other inmate.  To the contrary, it appears that all inmates have access to the same TV in the dayroom, the same slate of programming, which includes more than just TvONE, and the same access to cable television in their cells.  Chapman's suggestion that "maybe" he "does not have money to buy a TV" does not impact the equal protection analysis.  All that matters is whether Chapman was afforded the same opportunities that the other inmates were afforded, and the record shows that he was. *See Morrison*, 239 F.3d at 654 (holding that a plaintiff must demonstrate "that he has been treated differently from others with whom he is similarly situated").

Because Chapman has not established disparate treatment, the Court need not analyze the second prong of the *Morrison* test. *See* 239 F.3d at 654. However, were the Court to reach this issue, Chapman's claim would nevertheless fail because, again, he has utterly failed to provide "specific, non-conclusory factual [evidence] that establish[es] improper motive." *Trulock*, 275 F.3d at 405. Even if the Court were to liberally construe Chapman's claim as alleging a stigmatic injury based upon some perceived "differential governmental messaging," that theory would likewise fail because of the lack of "differential governmental treatment." *See Moore*, 853 F.3d at 250.

Thus, Claim Seven will be DISMISSED as to Defendants Shaw, Robinson, and Geo.[14]

## H.    Claim Eight

In Claim Eight, Chapman alleges that Defendants Jones, Woodson, and Cosby "<u>DENIED</u> Chapman twenty-one (21) times, a tracking number on regular grievances for <u>ALL</u> Black officers and staff . . . giving Chapman a tracking number for a white officer <u>only</u>." (ECF No. 97, at 7.) As noted above, Woodson and Cosby have previously been dismissed from this action. As such, the Court will consider Claim Eight as it relates to Defendant Jones.

For purposes of summary judgment, the following facts are established. Defendant Jones is the "acting Institutional Grievance Coordinator" at LCC. (Jones Decl. ¶ 1.) VDOC "Operating Procedure 866.1 ("OP 866.1") sets forth the institutional grievance procedures in place" at LCC. (*Id.* ¶ 6.) The criteria for acceptance of a grievance is set forth in OP 866.1 and on the back of the

---

[14] While not binding, *Banks v. Hiland*, No. 5:12–CVP197–R, 2013 WL 1679362, at *8 (W.D. Ky. April 27, 2013), is informative as to Chapman's Claims Three and Seven. In *Banks*, the plaintiff complained that, among other things, the Kentucky State Prison's failure to observe Martin Luther King Day and failure to provide Black Entertainment Television ("B.E.T.") violated his rights, including his right to Equal Protection. *Id.* In rejecting his claim, the court held that watching B.E.T. was not a necessity, that authorities had no duty to purchase television channels such as B.E.T., and that Banks had failed to show racial discrimination. *Id.*

grievance form. (*Id.* ¶ 7.) "The offender's race is not a criterion under OP 866.1." (*Id.* ¶ 16.) "If the grievance meets the criteria for acceptance, it is logged in and a receipt is issued to the inmate." (*Id.* ¶ 7.) "If a grievance does not meet the criteria for acceptance, the grievance is returned to the offender with an explanation of the reason for denial of intake." (*Id.* ¶ 18.) An inmate may appeal an intake decision. (*Id.* ¶¶ 7, 18.) From January 1, 2016, to December 31, 2019, "Chapman successfully filed two hundred twenty-one (221) regular grievances and informal complaints." (*Id.* ¶ 8.) Chapman filed grievances related to "access to health services, pharmacy services, [and] medical records," as well as issues related to the library and other "allegations in [this] lawsuit." (*Id.* ¶¶ 9–15.) During that time period, Defendant Jones personally "accepted intake of forty (40) Regular Grievances filed by Chapman. (*Id.* ¶ 19.)

Defendant Jones argues that the undisputed facts establish that she has not subjected Chapman to disparate treatment or discriminatory animus. (ECF No. 80, at 10.) Jones further argues that "Chapman is attributing discriminatory animus [to her] based on nothing more than speculation." (*Id.* at 12.) Chapman responds by saying that "[a]ll of Jones's statements are unconstitutional." (ECF No. 97, at 26.) He also summarizes several of the rejected grievances that Jones had returned to him. (*Id.* at 25.) In the instances Chapman cites, the reason for rejection was "<u>DOES NOT AFFECT YOU PERSONALLY</u>." (*Id.*) Chapman argues that his rejected grievances were proper and that the subject matter of his complaints did affect him personally. (*Id.*) Chapman freely admits that he has "no constitutional right to participate in a grievance proceeding," (*id.* at 23), which is an accurate statement of the law, *see Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017) (observing that "inmates have no constitutional entitlement or due process interest in access to a grievance procedure").

The record reflects that Defendant Jones conducted the initial intake review of grievances at LCC. Although Chapman is quick to attribute racial animus to nearly every action by prison officials, he fails to direct the Court to statements in the intake decisions of his grievances that reflect racial animus. Rather, Defendant Jones regularly refused to assign a tracking number because she concluded that Chapman's grievances failed to pass the intake criteria because of, *inter alia*, their trivial nature. Chapman does not direct the Court to a similarly situated inmate who filed similarly insubstantial or noncomplying grievances that were processed and received a tracking number. Indeed, Chapman does not identify a comparator inmate at all, whether similarly situated or not, insofar as Claim Eight is concerned.

Given Chapman's failure to identify a similarly situated comparator inmate, he has again failed to show that he was subject to disparate treatment. *See Morrison*, 239 F.3d at 654 (holding that a plaintiff must demonstrate "that he has been treated differently from others with whom he is similarly situated"). Because Chapman has not established disparate treatment, the Court need not analyze the second prong of the *Morrison* test. *Id.* (holding that if disparate treatment is established, the plaintiff must also prove that it was motivated by purposeful discriminatory intent). However, were the Court to reach this issue, Chapman's claim would nevertheless fail because, again, he has not provided "specific, non-conclusory factual [evidence] that establish[es] improper motive." *Trulock*, 275 F.3d at 405.

Accordingly, Claim Eight will be DISMISSED as to Defendant Jones.[15]

---

[15] In their Motion for Summary Judgment, the Defendants argue that several, if not all, of Chapman's claims should be dismissed because he has failed to exhaust his administrative remedies, as required under the PLRA. (ECF No. 80, at 12–13.) As close as the Court can tell, the Defendants aver that at least Claims One, Two, Three, Five, Six, and Seven should be dismissed on these grounds. (*Id.*) Chapman responds that in each instance he had taken his administrative remedies either to exhaustion or to a point of futility. (ECF No. 97, at 26–33.)

## IV. Conclusion

Accordingly, the Motions for Summary Judgment (ECF Nos. 79, 103) concerning Chapman's Equal Protection Clause Claims under the both the Virginia and United States Constitutions will be GRANTED as follows:

1.)  Claim One as to Defendant Shaw;

2.)  Claim Two as to Defendants Moore and Shaw;

3.)  Claim Three as to Defendants Moore and Shaw;

4.)  Claim Five as to Defendants Moore and Shaw;

5.)  Claim Six as to Defendants Shaw, Walker, and Geo;

6.)  Claim Seven as to Defendants Shaw, Robinson, and Geo; and,

7.)  Claim Eight as to Defendant Jones.

An appropriate Order will accompany this Memorandum Opinion.

Date: 24 September 2020
Richmond, Virginia

/s/
John A. Gibney, Jr.
United States District Judge

---

The PLRA "mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." *Ross v. Blake*, 136 S. Ct. 1850, 1854–55 (2016). In the ordinary course, the first step the Court would undertake in a case like this would be to determine whether Chapman had indeed complied with the administrative requirements placed upon him. However, while both parties provided volumes of grievance-related materials, neither provided adequate record citations to conclusively establish their position. More importantly, given Chapman's allegations of racial animus in the grievance process, as indicated in Claim Eight, it is unclear whether there were administrative remedies available for him to exhaust. *See id.* at 1860. As such, the Court was required to undertake a "thorough review" of the entire record to ferret out the answer. *Id.* at 1862. During the course of conducting that review, it became clear that Chapman's claims failed for a variety of reasons, as discussed above, in addition to potentially being barred for failing to exhaust administrative remedies. Given the inescapable conclusion that Chapman's claims obviously lack merit, the Court need not resolve this procedural issue.